**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**ERIE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **1:22-CR-00023-SPB** |
| | ) | |
| | ) | **SUSAN PARADISE BAXTER** |
| **vs.** | ) | |
| | ) | |
| **ERIE COKE CORPORATION,** | ) | |
| **ANTHONY NEARHOOF,** | ) | |
| | ) | **IN RE: ECF NO. 53, 54** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

This matter comes before the Court on a motion to strike surplusage (ECF No. 53) and a motion to dismiss the indictment for its failure to allege an offense (ECF No. 54) filed by the Defendants. This Memorandum Opinion addresses both motions. On November 15, 2022, the Erie Coke Corporation ("Erie Coke") and another Defendant, Anthony Nearhoof ("Nearhoof") were indicted for alleged violations of the Clean Air Act ("CAA"). Erie Coke and Nearhoof (collectively, "Defendants") have moved to dismiss the indictment, arguing that their actions did not fall within the purview of 42 U.S.C. § 7413(c)(2)(C) and 42 U.S.C. § 7413(c)(1), the statutory provisions which the Government contends were violated. *See* ECF No. 54.  The Defendants have additionally moved pursuant to Federal Rule of Criminal Procedure 7(a) to strike what they deem "surplusage" in the indictment. *See* ECF No. 53. The Government has filed a response in opposition to the motions. ECF No. 64. The Defendants filed a reply (ECF No. 67) and the Government filed a memorandum sur-reply (ECF No. 72). These matters are now ripe for disposition.

## I.    Relevant Background

### A.    The Clean Air Act

Congress passed the CAA in order to "protect and enhance the quality of the [United States'] air resources." 42 U.S.C. § 7401(b)(1). *See also United States v. Long*, 2024 WL 4711946, at *1 (E.D. Va. Nov. 7, 2024). The CAA's subchapter 1 ("Title I"), "Programs and Activities," covers, in general, air quality, emission limitations, and ozone protections. *See §§* 7401-7515. Title I also covers limitations on emissions from stationary sources. Title I, § 113 of the CAA provides the Government with various mechanisms to enforce the statute's provisions. Criminal penalties are one such mechanism available to the Government. *See* § 113(c)(2). Section 113(c)(2)(C), one of the provisions under which the Government has charged the Defendants, provides that "[a]ny person who knowingly[ ] … falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under" the CAA "shall, upon conviction, be punished by a fine … or by imprisonment of not more than 2 years, or both." 42 U.S.C. §7413(c)(2)(C). Subsection § 7413(c)(1) criminalizes violations of "any requirement or prohibition of an applicable implementation plan… ." *See, e.g., United States v. Carroll*, 2024 WL 4039807, at *2 (E.D. Mo. Sept. 4, 2024).

### B.    Factual Background

The factual background is taken from the allegations in the Indictment and assumed as true for purposes of the instant motions. *United States v. Blount*, 2025 WL 406035, at *2 (W.D. Pa. Feb. 5, 2025) *citing United States v. Hird*, 913 F.3d 332, 339 (3d Cir. 2019). Erie Coke owned and operated a coke manufacturing plant on a site on Erie's bayfront from 1987 until 2019. ECF No. 3, ¶ 3 (Indictment). Coke has been manufactured on that site since 1925. *Id*., ¶ 2.

2

Nearhoof was employed by Erie Coke from 2001 until December, 2019. *Id*. He became a foreman in 2003 and, after a series of promotions, plant superintendent in 2015. *Id*. He served in that role until the plant's closure in 2019. *Id*.

The Indictment explains the coke manufacturing process:

> Coke is a byproduct used in steel mills, foundries, and other industrial processes. Coke is produced through the prolonged heating of coal in sealed ovens at temperatures of up to 2,000 degrees. The heating of coal takes place in groups of ovens called batteries. [Erie Coke] operated two coke oven batteries: Battery A comprised of 23 ovens and Battery B comprised of 35 ovens. [Batteries A and B were] operated 24 hours a day, 365 days a year.

> The ovens were constructed adjacent to one another, sharing a common side wall made of brick. There were multiple vertical spaces, called flues, between the walls of each oven, in which natural gas or recycled coke oven gas (COG) was combusted to heat the ovens and "cook" the coal. The flues extended to the top of the ovens, and each flue was covered with a four-inch diameter cap.

*Id*., ¶¶ 5-6. The manufacturing process generates numerous air pollutants, including gasses such as benzene, toluene, and xylene, as well as particulate matter which may affect human health and the environment. *Id*., ¶ 10. The Indictment alleges that leaks from the coke ovens into the flues through cracks and holes in the oven were a "constant problem" at Erie Coke. *Id*., ¶ 7. Consequently, federal and state statutes regulated the plant's production and both the federal Environmental Protection Agency ("EPA"), and the state Department of Environmental Resources ("DEP") monitored Erie Coke's compliance and enforced the statues. *Id*., ¶ 10.

In order to operate, the Erie Coke plant must comply with Title V of the CAA. *See* 42 U.S.C. § 7661a ("Title V") (1990 amendments). Under Title V, a permitting program was established to regulate emissions from sources of air pollution such as coke plants. ECF No. 3, ¶ 12. Erie Coke, as a "stationary source," was required to meet certain emission limits, adhere to specific work standards, monitor air emissions, and report air emissions to federal and state

authorities. *Id.* The CAA directs each state to develop a permit program under state or local law that meets the requirements of Title V of the Act for review and approval by the federal EPA. *Id.*, ¶ 14; *see also PennEnvironment, Inc. v. United States Steel Corp.*, 2022 WL 973706, at *2 (W.D. Pa. Mar. 31, 2022). The state DEP granted Erie Coke a Title V permit, which was most recently renewed on March 27, 2013. *Id.*, ¶ 15.

To comply with the emission opacity[1] limitations set out in the Title V permit, Erie Coke installed a Continuous Opacity Monitor ("COM") in 2010, after enforcement actions were brought by the state DEP for violations of the permit and state air pollution laws. *Id.*, ¶ 22. Erie Coke agreed to rebuild all 23 ovens in Battery A as well as 4 ovens in Battery B. *Id.* Erie Coke placed its COM near the top of the plant's smokestack. Such placement meant that the COM could only measure emission that came directly via the batteries to the smokestack and then into the air. Any emissions which bypassed the smokestack, and hence the COM, could not be measured. *Id.* ¶ 29.

Erie Coke's Title V permit mandated the company maintain emission opacity at certain levels. If opacity levels exceed 25% for more than three minutes in any one-hour period or more than 60% at any time, Erie Coke was in violation of its permit and the company was exposed to criminal and/or civil liability. *Id.* ¶ 25. The Title V permit also prohibited any "technique" which concealed the "emission of any contaminants which would otherwise be in violation" of the permit. *Id.* ¶ 28. Defendant Nearhoof was required to certify quarterly compliance reports to the state DEP and he certified numerous such reports between October of 2015 and January of 2020. *Id.*, ¶ 26. However, during much of this time, Erie Coke experienced opacity levels that

---

[1] The Indictment explains that "opacity" is "a measure of the amount of visible light blocked by particulate matter in emissions" and is "an indicator of the level of emissions of air contaminants, such as particulate matter, being emitted into the air." ECF No. 3, ¶ 21.

frequently measured near or above the 20% limit on many days. *Id.*, ¶ 30. The Indictment alleges

that on many occasions, opacity levels of more than 60% were not uncommon. *Id*. These spikes

in opacity level were often followed by "sudden sharp decreases" after a few minutes. *Id*. In July

of 2019, the state DEP denied Erie Coke's renewal of its Title V permit based on the plant's

history of noncompliance. *Id*. ¶ 31. Erie Coke closed its bayfront facility in December of 2019.

*Id*.


    **C.**    **Procedural History**

On November 15, 2022, the Grand Jury indicted Erie Coke and Nearhoof as follows:

| Count | Violation |
|-------|-----------|
| One | Conspiracy to violate the Clean Air Act from October 2015, through December 2019, in violation of 18 U.S.C. §§ 371 and 2 |
| Two | Tampering with a monitoring device and method from November 15, 2017, through December 2019, in violation of 42 U.S.C. § 7413(c)(2)(C) and 18 U.S.C. § 2 |
| Three | Violating Erie Coke's Title V permit by emitting unburned coke oven gas emissions from November 15, 2017, through December 19, 2019, in violation of 42 U.S.C. § 7414(c)(1) and 18 U.S.C. § 2 |
| Four | Violating Erie Coke's Title V permit by exceeding opacity limits on January 1, 2018, in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 |
| Five | Violating Erie Coke's Title V permit by exceeding opacity limits on January 7, 2018, in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 |
| Six | Violating Erie Coke's Title V permit by exceeding opacity limits on May 30, 2018, in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 |
| Seven | Violating Erie Coke's Title V permit by exceeding opacity limits on July 4, 2018, in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 |
| Eight | Violating Erie Coke's Title V permit by exceeding opacity limits on July 25, 2018, in violation of 42 U.S.C. § 7413(c)(1) and 18 U.S.C. § 2 |

*See* ECF No. 3, pp. 10-17. The Defendants moved to dismiss all counts of the Indictment,

excepting Counts One and Three. *See* ECF No. 54, p. 1. They have also moved to strike certain

language stated in the Indictment. ECF No. 53. The Court will begin with Defendants' motion to dismiss the Indictment.

## II.    Defendants' Motion to Dismiss Indictment

### A.    Standard of Decision

"Federal Rule of Criminal Procedure 12(b)(3)(B)(v) authorizes a defendant to lodge a pretrial challenge to the sufficiency of an indictment for 'failure to state an offense.'" *Blount*, 2025 WL 406035, at *2, *citing United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016). In bringing such a motion, a defendant may "claim that an indictment fails to state an offense on the basis that the specific facts alleged...fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Willis*, 844 F.3d at 162. In considering such a motion, the court takes the factual allegations in the Indictment, as well as those stated in the Bill of Particulars, as true. *Id. citing Hird*, 913 F.3d at 339. "In sum, the Court generally engages in 'a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury.'" *United States v. Miah*, 546 F. Supp. 3d 407, 418 (W.D. Pa. 2021) *quoting United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011). A motion to dismiss is "'not a permissible vehicle for addressing the sufficiency of the government's evidence.'" *United States v. Gillette*, 738 F.3d. 63, 74 (3d Cir. 2013) *quoting United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). Such challenges are reserved for trial. *Id.* In a criminal case the "government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29," after the government has presented its evidence. *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000) (emphasis added).

An indictment is sufficient to survive a motion to dismiss for failure to state an offense if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Fattah*, 858 F.3d 801, 814 (3d Cir. 2017) *quoting United States v. Stevenson*, 832 F.3d 412, 423 (3d Cir. 2016). *See also United States v. Fahmy*, 2025 WL 345081, at \*2 (M.D. Pa. Jan. 30, 2025). "'No greater specificity than the statutory language is required so long as there is sufficient factual orientation' to permit a defendant to prepare his defense and invoke double jeopardy." *Huet*, 665 F.3d at 595, *quoting United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007), *abrogated on other grounds as recognized in United States v. Hill*, 98 F.4th 473 (3d Cir. 2024). An indictment is generally sufficient where it "informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *Id. quoting United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005). "In contrast, if an indictment fails to charge an essential element of the crime, it fails to state an offense." *Id. citing United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979).

In reviewing a motion to dismiss, a district court must consider only the facts alleged in the indictment. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). That is to say, a federal court must determine the sufficiency of an indictment from its "four corners" and can only grant dismissal if it is deemed "so defective that it does not, by any reasonable construction, charge an offense." *Id. See also Willis*, 844 F.3d at 162. The Court's review is therefore limited to determining whether, assuming the facts alleged in the indictment are true, "a jury could find that the defendant committed the offense for which he was charged." *Huet*, 665 F.3d at 596. A

district court should generally uphold an indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense." *Willis*, 844 F.3d at 162, *quoting Vitillo*, 490 F.3d at 324. An indictment "need not be perfect, and common sense and reason are more important than technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001) *quoting* CHARLES ALAN WRIGHT, *FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d* § 123, at 347 (1982).

### B.    Count Two

At Count Two, the Indictment alleges that

> From on or about November 15, 2017, and continuing until on or about December 19, 2019, in the Western District of Pennsylvania, the Defendants, [Erie Coke] and [Nearhoof], did knowingly tamper with and render inaccurate a monitoring device, to wit, the COM, which was required to be maintained and operated by Defendant [Erie Coke's] Title V permit Section C-006, by venting pollutants, including particulate matter and release coke oven gas and other hazardous pollutants, from open flues on the coke oven batteries in such a manner as to prevent the accurate reporting of actual opacity emissions to PADEP. In violation of Title 42, United States Code, Section 7413(c)(2)(C), and Title 18 United States Code, Section 2.

ECF No. 3, p. 15, ¶ 49. The Defendants contend the Indictment fails to allege that their actions amounted to tampering with or rendering inaccurate the COM. ECF No. 54, p. 4. They draw a distinction between tampering with the COM device itself and tampering with the device's method of testing air quality, submitting that Count Two charges the Defendants only with tampering with the COM itself. *Id*. In other words, Defendants contend that this count should be dismissed because the tampering alleged, *bypassing emissions from* the COM, does not amount to *tampering with* the COM. *Id*.

8

The Government rejects this interpretation of Count Two. First, it contends that the Indictment does mention a method of tampering with the device. The Government points to Paragraph 33(a) of the Indictment which alleges that the Defendants violated § 7413(c)(2)(C) by "knowingly falsifying, tampering with, and rendering inaccurate a monitoring device and method required to be maintained under the Clean Air Act." ECF No. 3, ¶ 33(a). Although this language was related in Count One (the conspiracy count) of the Indictment, the Government points out that the allegation was incorporated by reference into Count Two. ECF No. 64, p. 9.

At the outset, the Court notes that the Indictment charges Defendants with "rendering inaccurate" the data collected by the COMs. ECF No. 3, ¶ 49. They are alleged to have done so in specific terms: by diverting and rerouting pollutants from COM monitoring. They are alleged to have rendered any readings from the device inaccurate. The Defendants were, therefore, appropriately charged with violating the statute.

Turning to the arguments raised in the Defendants' motion, the Government submits that Count Two's language sufficiently put the Defendants on notice that they were charged with tampering with or rendering inaccurate a testing method regardless of whether the word "method" was actually used. *Id*., p. 10. The Government points out that Count Two specifically charged Defendants with bypassing the COM by venting air pollutants away from the smokestack "in such a manner as to" render any opacity readings inaccurate. *Id*. Count Two, the Government argues, explicitly relates how the Defendants tampered with the COM's testing method.

Lastly, the Government asserts that even absent the word "method" and a description of any method of tampering, a reasonable jury would yet be able to find that Defendants tampered with a "device." *Id*., p. 11. After pointing out the Defendants' acknowledgement that a "device"

9

and a "method" can overlap, the Government argues that tampering with a device connotes interfering with the method used by the instrument to fulfill its function, here the accurate measurement of emissions. And, since the Defendants are alleged to have bypassed or redirected emissions so as to render the COM's measurements inaccurate, the Government contends the Indictment sufficiently alleged that Defendants have tampered with a device. *Id*. The Court reaches the same conclusion as the Government.

As the Government notes, the Indictment's paragraph 33(a) does charge Defendants with "… tampering with … a monitoring device and method required to be maintained under the Clean Air Act." ECF No. 3, ¶ 33(a). Although this allegation appears in Count One of the charging instrument, it is incorporated by reference into Count Two. Where a count incorporates by reference offenses charged elsewhere in the indictment, the indictment sufficiently charges an offense in that subsequent count. *See, e.g., United States v. Dumas*, 1992 WL 2415, at *1 (E.D. Pa. Jan. 2, 1992); *United States v. LaBar*, 506 F. Supp. 1267, 1277 (M.D. Pa. 1981), *aff'd*, 688 F.2d 826 (3d Cir. 1982) (holding that while the indictment would have been clearer had it merely stated that paragraphs one through five on pages eight and nine of the indictment are incorporated by reference, the language used is not sufficiently unclear or ambiguous to warrant dismissing the indictment). Furthermore, the Federal Rules of Criminal Procedure permit a count to "incorporate by reference an allegation made in another count." Fed. R. Crim. P. 7(c)(1). *See also United States v. Menendez*, 137 F. Supp. 3d 688, 706 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016) *quoting Kemp*, 500 F.3d at 280.

Moreover, the Court is satisfied that regardless of whether paragraph 33(a) explicitly includes the term 'method,' paragraph 49 clearly informs the Defendants that their alleged illegal actions involved interfering with or compromising a device's testing method, even if that precise

wording is absent. Paragraph 49's express language states that the Defendants "knowingly tamper[ed] with and render[ed] inaccurate a monitoring device, to wit, the COM . . . in such a manner as to prevent the accurate reporting of actual opacity emissions to PADEP." ECF No. 3, ¶ 49. Manipulating the process whereby a COM tests opacity emissions so that false readings are reported interferes with the device's method of collecting dating.  Likewise, the Court rejects Defendants' contention that the statute limits "tampering" or "rendering inaccurate" to interference with the device's physical apparatus. *See* ECF No. 54, p. 4. They cite no authority for this narrow reading of the statute and the Court has not located any precedent limiting the statute in such a manner. The Government has called the Court's attention to analogous decisions interpreting similar provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(c)(4).[2]

Here, the Indictment contains sufficient allegations to survive the Defendants' motion to dismiss Count Two. The Indictment identifies the statute the Defendants allegedly violated, *i.e.*, 42 U.S.C. § 7413(c)(2)(C) and 18 U.S.C. § 2. *See* ECF No. 3, p. 15. It apprises them of the elements of a § 7413(c)(2)(C) offense—as well as identifies the specific crimes relevant for the third element—by closely tracking the language of the statute. *Id*. Count Two of the Indictment states approximately when the Defendants allegedly committed the charged crime. *Id*. Simply put, this information is all the Indictment needs to survive the Defendants' challenge. *See Huet*, 665 F.3d at 595; *United States v. Manganas*, 2017 WL 2547310, at *4 (M.D. Pa. June 13, 2017) (finding indictment sufficient when it identified charging statute, elements of the offense by tracking statutory language, and specifying time period of alleged offense). The motion will be denied as to Count Two of the Indictment.

---

[2] The Clean Water Act uses nearly identical language.  33 U.S.C. § 1319(c)(4) imposes criminal liability on anyone who "knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained under this chapter."

11

### C.    Counts Four through Eight

The Defendants also move to dismiss Counts Four, Five, Six, Seven, and Eight of the Indictment. *See* ECF No. 54. They contend that these counts allege nothing more than they operated the Erie Coke facility on a date when a permit violation occurred instead of alleging that they knowingly violated their permit. *Id*., pp. 8-13. Counts Four through Eight contain the following allegation:

> … ECC and Nearhoof, did knowingly operate and cause to be operated, a stationary source, to wit, the ECC coke facility, in violation of its Title V permit, Section C-004, through exceeding of the applicable opacity limits … in violation of Title 42, United States Code, Section 7413(c)(1), and Title 18, United States Code, Section 2.

ECF No. 3, p. 17. The Defendants maintain that, as written, the allegation does not allege they knowingly violated the permit. Defendants read the Indictment too narrowly. *See, e.g., United States v. Evans*, 2021 WL 5279896, at *5 (M.D. Pa. Nov. 12, 2021) (defendant read indictment "too narrowly and failed to recognize the numerous factual allegations […] that were incorporated by reference in these Counts."). As the Government points out, the Indictment specifically charges the Defendants with "knowingly violating the … requirements of the defendants ECC's Title V permit: … Section C004." *Id*. p. 10, ¶ 33(b). That allegation was incorporated by reference into Counts Four through Eight and defeats the Defendants' contention that their knowing violation of the Title V permit was not alleged.

Moreover, reviewing all facts alleged in the Indictment and taking them as true, there are more than sufficient factual allegations to support the Defendants' knowledge that the opacity levels at the factory violated the ECC's Title V permit on the dates specified in these counts. The Indictment on the whole is replete with allegations that Defendants knew about the

purported permit violations. As noted by the Government, the Indictment alleges that Defendant

Nearhoof "dealt regularly with employees, including Co-Conspirator A, about coke oven battery

issues, including increases in opacity levels related to the coking process"; "Defendant ECC

installed the COM as part of a July 2010 resolution of enforcement actions brought by PADEP

for violations of defendant ECC's Title V permit and state air pollution laws, including

violations for excessive opacity emissions from the coke oven battery stack"; "The opacity levels

and time were recorded on a circular paper chart placed into the measuring device every 24

hours. The instantaneous COM readings were also displayed on a large 'scoreboard'-like

electronic screen visible from the top of the coke oven batteries. Defendant ECC also stored the

minute-by-minute readings in electronic form"; and "Between in and around October 2015 and

in and around December 2019, recorded opacity levels at ECC frequently spiked upward near or

above the 20% limit on many days; spikes above 60% were not uncommon." ECF No. 3, ¶¶ 17,

22, 30, and 35.

Defendants' assertion that these counts of the Indictment "omit[] knowledge with respect

to violating the opacity limits" are without merit. *See* ECF No. 54, at 9. To the contrary and as

referenced above, the Indictment explicitly alleges that Defendants were aware of opacity limit

violations and took deliberate action in response. The Government has sufficiently alleged that

Defendants had continuous knowledge of opacity exceedances—information that was readily

available to them through the "scoreboard," which provided real-time updates regarding

emissions levels. According to the Indictment, Defendants responded to these exceedances by

removing the flue caps to bypass the Continuous Opacity Monitoring System ("COM"), thereby

evading regulatory oversight. Such allegations, when viewed in the light most favorable to the

Government, sufficiently establish the requisite knowledge element for the charged offense. *See*

*Manganas*, 864 F.3d at 324 (holding that an indictment need only set forth sufficient factual allegations to place the defendant on notice of the charges and to allow for a defense). Accordingly, Defendants' argument regarding the purported omission of knowledge is unpersuasive.

In their reply brief, Defendants attempt to circumnavigate the sufficiency of these allegations by arguing that the insufficient allegations of knowledge resulted from the Grand Jury's failure to find that element of the offense. *See* ECF No. 67, p. 3. They reference the Parties' disagreement over "what knowledge means in this case." *Id*. p. 2. In support of their argument, the Defendants cite to certain Third Circuit Model Criminal Jury Instructions relating to definition of "knowledge," asking the Court to define that term at this juncture in the proceedings. *See* ECF No. 67, p. 4. But, as the Supreme Court has explained,

> "[i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

*Costello v. United States*, 350 U.S. 359, 408-09 (1956) (denying motion to dismiss the indictment where the evidence before the grand jury constituted hearsay). *See also United States v. Gibbs,* 2025 WL 815207, at *10 (D. Del. Mar. 13, 2025) *quoting Costello,* 350 U.S. at 363.

The Supreme Court in *Bryan v. United States* explained that "unless the text of the statute dictates a different result, the term 'knowing' merely requires proof of knowledge of the facts that constitute the offense." 524 U.S. 184, 193 (1998). The tampering provision of the CAA does not demand specific knowledge that the acts were unlawful. *See* 42 U.S.C. § 7413(c)(2)(C).

These Counts "contain[] the elements of the offense intended to be charged and sufficiently

apprise[d] the defendant[s] of what [they] must be prepared to meet, and … allows [them]to

plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United*

*States v. John-Baptiste*, 747 F.3d 186, 195 (3d Cir. 2014) *citing Russell v. United States*, 369

U.S. 749, 763–64 (1962) and *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quotations

omitted). The motion to dismiss Counts Four through Eight of the Indictment will be denied.


**III.     Defendants' motion to strike certain language of the Indictment**

Defendants contend that the Indictment contains numerous recitations of irrelevant and

immaterial information. *See* ECF No. 53, pp. 3-4. Summarized, the Defendants object to

references to the geographic and demographic location of the coke plant and any reference to

pollutants which cause cancer or other health problems. They argue that such language is

inappropriate and should therefore be stricken from the Indictment to protect the Defendants

against prejudicial allegations that are neither relevant nor material to the charges made in the

indictment pursuant to Federal Rule of Criminal Procedure 7(d). *See id., generally*. In this case,

the Government maintains the challenged language is relevant to the elements of the charged

offenses and therefore are appropriately contained in the indictment. The Government further

argues that the Defendants have failed to establish that the challenged language unfairly portrays

the facts that will be established at trial. After due consideration, the Court agrees with the

Government and the motion will be denied.


Under Federal Rule of Criminal Procedure 7(d), a federal court will strike surplusage

from an indictment only upon a finding that the language at issue is both irrelevant and

prejudicial. *See* Fed. R. Crim. P. 7(d); *see also United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) (emphasizing Rule 7(d) requires both irrelevance and prejudice for a court to strike surplusage); *United States v. Weiss*, 588 F. Supp. 3d 622, 632 (E.D. Pa. 2022); *United States v. Lalley*, 2010 WL 3946659, at *3 (D.N.J. Oct. 5, 2010) *quoting Hedgepeth*, 434 F.3d at 612. The information set out in an indictment is relevant as long as "it is in a general sense relevant to the overall scheme charged in the indictment." *Lalley*, 2010 WL 3946659, at *3 *quoting United States v. Giampa*, 904 F. Supp. 235, 271–72 (D.N.J. 1995). A court will only strike surplusage in rare cases. *See United States v. Stock,* 2012 WL 202761, at *12 (W.D. Pa. Jan. 23, 2012), *aff'd,* 728 F.3d 287 (3d Cir. 2013); *United States v. Alsugair*, 256 F. Supp. 2d 306, 317 (D.N.J. 2003) (noting the "exacting standard" used to evaluate motions to strike); *United States v. Syed*, 2025 WL 635300, at *9 (D.N.J. Feb. 27, 2025). The decision to strike surplusage is committed to the discretion of the district court. *See United States v. Figueroa*, 900 F.2d 1211, 1218 (8th Cir.), *cert. denied*, 496 U.S. 942 (1990).

The Defendants initially contend that language regarding the proximity of "vulnerable populations" and references to substances that have been identified as causing cancer, birth defects, and other health problems should be struck from the indictment because such language is irrelevant, speculative, and prejudicial. *See* ECF No. 53, p. 6. They first object to the inclusion of this language in the Indictment:

| Indictment Paragraph | Disputed Language |
|---|---|
| ¶ 1 | "Numerous private residents and public facilities were located within close proximity to ECC, including the Pennsylvania Soldiers' and Sailors' Home (a residence for veterans), the Erie Main Campus of the Barber National Institute for adults and children with disabilities, an elementary and a middle school, and a marina." |

This language is relevant and not prejudicial. First, the location of the facility within the community is relevant. As noted in their brief in opposition, the Government intends to introduce evidence derived from law enforcement surveillance conducted at the ECC plant, including observations made from the parking lots of the adjacent marina and the nearby Barber National Institute, an organization serving individuals with disabilities. *See* ECF No. 64, p. 21. Additionally, the Government points out that the PADEP documented instances of coke contamination on properties adjacent to the facility through photographic evidence taken from various nearby locations. *See id*. This evidence is probative of the Government's assertion that the Defendants intentionally opened flue caps, thereby increasing coke emissions from the factory's smokestack. More specifically, the Government proffers that it will likely submit evidence regarding law enforcement surveillance of the ECC plant, some of which surveillance occurred in the parking lots of the marina and the Barber National Institute. The PADEP also took photos of coke contamination on properties surrounding the facility. This evidence supports the Government's theory that Defendants were opening flue caps and allowing increased coke emissions to emit from the stack. It is thus relevant and should not be stricken. *See, e.g., United States v. Settle*, 2022 WL 1125568, at *2 (D. Kan. Apr. 15, 2022) (court declined to strike language that provided background and historical information concerning Government's investigation because the allegation helped the jury to understand why the regulatory agencies, including the EPA, "turned their attention to the [the defendant's] facility). Information concerning the impetus for the investigation, or how it unfolded is part of the "*res gestae*, as part and parcel of the proof of the offense [ ] charged and is potentially relevant evidence." *See id*. (internal quotation marks omitted).

Nor is the inclusion of this information about the ECC plant's vicinity irrelevant or prejudicial. As the Government points out, the jury will learn during the trial the background details of the Government's investigation, which include how investigators were able to observe Defendants' conduct and from where they did so. *See, e.g., United States v. Fillers*, 2010 WL 3655868, at *9 (E.D. Tenn. Sept. 14, 2010). Therefore, the language in the Indictment regarding the location of the ECC plant and its vicinage is information which the Government will attempt to prove at trial, and the inclusion of that information in the Indictment is hardly prejudicial.

The Defendants also ask that the Indictment be sanitized from any reference to the health implications from particulate air pollution which may or may not have been expelled from the ECC plant. They object to the following passages:

| Indictment Paragraph | Disputed Language |
|---|---|
| ¶ 10 | "and particulate matter that may affect human health and the environment." |
| ¶ 18 | ". . . particulate matter has been linked to a variety of health problems, including increased respiratory symptoms, such as irritation or the airways, coughing, or difficulty breathing; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal heart attacks; and premature death in people with heart or lung disease." |
| ¶ 19 | "Hazardous air pollutants, also known as toxic air pollutants or air toxics, are pollutants that are known or suspected to cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental effects." |
| ¶ 40 | "It was further a manner and means of the conspiracy that the improper venting of COG to bypass the COM and minimize opacity readings resulted in the spread of air pollutants outside the facility's boundaries to adjoining residential and commercial areas, which presented potential dangers to the public health and safety." |

The Defendants challenge the inclusion of the above cited passages because they refer to what they deem speculative instances of health problems associated with certain pollutants. *See* ECF No. 53, p. 2. They claim this case involves violations of "environmental monitoring and

permit requirements" resulting in the "mere release of certain substances." *Id*. The Court

disagrees and finds this language relevant and material. First, the excerpts referenced above

provide background information as to why the EPA has promulgated complex regulations

applicable to air pollutants in order to protect public health and why the potential disbursement

of these substances into the air is monitored in the first place. Courts have refused to strike

similar language from indictments. In support of its position, the Government points to *United

States v. CITGO Petroleum Corp.*, 2007 WL 712880, at *1 (S.D. Tex. Mar. 6, 2007). There, the

defendants moved to strike allegations regarding effects of hazardous air pollutants, in particular

the "increased incidence of leukemia in humans exposed to benzene." *Id*. The court refused to

strike that language, holding that it "provides information explaining why the EPA has

promulgated complex benzene regulations … [t]herefore, the above information aids in

understanding the complex regulations in question and provides helpful context." *Id*.

The Defendants characterize this case as a straightforward matter of "environmental

monitoring and permit requirements" concerning nothing more than the "mere release of certain

substances." ECF No. 53, p. 2. This framing disregards the fundamental purpose behind the

statutory provisions the Defendants are alleged to have violated: safeguarding both human health

and the environment. As noted by the Government, the CAA establishes a framework for

controlling air pollution from stationary sources like the ECC facility, employing regulatory

programs such as the National Ambient Air Quality Standards (NAAQS), 42 U.S.C. §§ 7408-

7410, and the Hazardous Air Pollutants (HAP) program, 42 U.S.C. § 7412. *West Virginia v.

EPA*, 597 U.S. 697, 707 (2022). The NAAQS program is specifically designed to address air

contaminants that "may reasonably be anticipated to endanger public health or welfare." 42

U.S.C. § 7408(a)(1). The pollutant thresholds established by the Environmental Protection

Agency (EPA) under this program define "the maximum airborne concentration of [the] pollutant that the public health can tolerate." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 465 (2001) *citing* 42 U.S.C. § 7409(b)(1). Similarly, the limits on particulate matter pollution—measured by the COM—exist precisely to mitigate pollution levels that "may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1) (emphasis added).

Here, the Government points out that the ECC plant was required to install the COM in its exhaust stack because of its continuous and persistent failure to operate the coke ovens in compliance with the CAA. The opacity measurements are used to determine the level of particulate pollutants—those subject to NAAQS. The emission of pollutants from open flues bypassed the COM, rendering the readings as an inaccurate measurement of the particulate pollution threatening the surrounding community. That is the basis for the criminal prosecution. Defendants' conduct will be better understood by the jury in the context of the purpose of the CAA, the COM, and the permit requirements, and the basis for the investigation.[3]

Further, Defendants fail to demonstrate that any alleged surplusage would result in unfair prejudice. The Government cites to *United States v. Empire Bulkers Ltd.*, 583 F. Supp. 3d 746, 760 (E.D. La. 2022), *reconsideration denied*, 2022 WL 3646069 (E.D. La. Aug. 24, 2022).

---

[3] Defendants' reliance on *United States v. Lippold*, 2006 WL 3780983, at *2 (C.D. Ill. July 11, 2006), to support their argument is misplaced as *Lippold* is inapposite. That case did not concern a motion to strike surplusage; rather, it involved the Government's effort to preclude defendants from introducing evidence that their conduct caused no harm to human health or the environment. *Id.* The *Lippold* court ruled that such harm-related evidence was irrelevant to proving a criminal violation of the statute. *Id.* It did not establish a standard for determining the propriety of allegations in an indictment. Here, the allegations in question are not about proving harm; they are about the statutory and regulatory context underlying Defendants' obligations, which is relevant and material.

There, the court rejected a similar argument where defendants claimed that references to pollution and explosions were inflammatory and irrelevant to the charges. The court held that any potential prejudice was cured by jury instructions that clarified the actual charges. *Id*. The same principle applies here. The jury will receive explicit instructions regarding the elements of the offenses and any applicable defenses, mitigating any risk of confusion or prejudice. Moreover, as a practical matter, it is unlikely that the jury will receive a copy of the Indictment during deliberations. This further diminishes any potential prejudice. *See United States v. Goldner*, 2023 WL 8469760, at *3 (3d Cir. 2023) (finding no prejudice where the indictment was not read or shown to the jury); *Hedgepeth*, 434 F.3d at 613 (holding that surplusage claims fail when the jury is not exposed to the challenged allegations).

Defendants have not demonstrated that the allegations they seek to strike are irrelevant, immaterial, or prejudicial. Accordingly, their Motion to Strike Surplusage will be denied.

An appropriate Order follows.